**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **TULSA CANCER INSTITUTE, PLLC, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 4:15-cv-00157-TCK-TLW** |
| **GENENTECH INC., a California Corporation,** | |
| **Defendant.** | |

**GENENTECH, INC.'S MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.    FACTUAL BACKGROUND ......................................................................................... 3

III.   LAW AND ARGUMENT ............................................................................................. 6

      A.    Plaintiffs' Allegations Regarding The Net Weight, Concentration, And Total Reconstituted Volume Of Herceptin Fail To State A Claim Under Any Theory. ................................................................................................... 6

           1.    Plaintiffs' assertion that vials do not contain 440 milligrams of Herceptin is belied by their own Complaint and even if accepted as true, fails to show any misconduct. ............................................... 6

           2.    Plaintiffs' allegations regarding the concentration of the reconstituted solution fail to show any misconduct. .................................... 8

           3.    Plaintiffs' allegation that each vial should contain a reconstituted volume of 20.952 milliliters does not show any misconduct. .................... 9

      B.    Plaintiffs' Extractable Volume Allegations Fail To Show Any Misconduct. ............................................................................................... 10

      C.    Plaintiffs' Claims Are Preempted By Federal Law. ............................................... 13

           1.    State-law claims that would impose obligations requiring prior FDA approval are preempted under recent Supreme Court decisions. ......................................................................................... 14

           2.    Reformulating Herceptin to ensure each vial delivers a volume of 20.952 milliliters following reconstitution would require prior FDA approval. ......................................................................................... 17

      D.    Plaintiffs' Warranty Claims Fail As A Matter Of Law. ........................................ 18

           1.    The net weight and concentration statements in the Herceptin labeling are federally mandated disclosures and thus do not constitute an express warranty. ............................................................. 19

           2.    Genentech has not breached any express warranty. ................................. 21

           3.    Plaintiffs have failed to plead any injury. .................................................. 22

      E.    Plaintiffs' Unjust Enrichment Claim Fails As A Matter Of Law. .......................... 23

IV.   CONCLUSION ......................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adamson v. Ortho–McNeil Pharm., Inc.*,
    463 F. Supp. 2d 496 (D.N.J. 2006) ............................................................................4

*Alvarado v. KOB-TV, LLC*,
    493 F.3d 1210 (10th Cir. 2007) ................................................................................4

*Amos v. Biogen Idec Inc.*,
    28 F. Supp. 3d 164 (W.D.N.Y. 2014) ......................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................6, 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................6, 11, 13

*Booker v. Johnson & Johnson*,
    54 F. Supp. 3d 868 (N.D. Ohio 2014) ....................................................................17

*Buhendwa v. Regional Transp. Dist.*,
    82 F. Supp. 3d 1259 ..................................................................................................5

*Carter v. Alcon Labs., Inc.*,
    2014 WL 989002 (E.D. Mo. Mar. 13, 2014) ..........................................................16

*Clappier v. Flynn*,
    605 F.2d 519 (10th Cir. 1979) ..................................................................................7

*Ebner v. Fresh Inc.*,
    2013 WL 9760035 (C.D. Cal. Sept. 11, 2013) ..........................................2, 13, 24

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000) ................................................................................................14

*Hawkins v. UGI Corp.*,
    2016 WL 270372 (C.D. Cal. Jan. 21, 2016) ..........................................2, 12, 13, 22

*Higgins v. Monsanto Co.*,
    862 F. Supp. 751 (N.D.N.Y. 1994) ........................................................................20

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    779 F.3d 34 (1st Cir. 2015) ..............................................................................16, 17

*In re Universal Serv. Fund Tel. Billing Practice Litig.*,
  619 F.3d 1188 (10th Cir. 2010) ........................................................................... 13

*Morrison v. Stonebridge Life. Ins. Co.*,
  2015 WL 137261 (W.D. Okla. Jan. 9, 2015) ........................................................ 23

*Mutual Pharm. Co. v. Bartlett*,
  133 S. Ct. 2466 (2013) .................................................................... 3, 14, 15, 16, 17

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
  565 F.3d 683 (10th Cir. 2009) .............................................................................. 5, 7

*Naylor Farms, Inc. v. Anadarko OGC Co.*,
  2011 WL 7267851 (W.D. Okla. June 15, 2011) ................................................... 23

*O'Connor v. Henkel Corp.*,
  2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015) ........................................... 8, 10, 20

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002) ............................................................................... 4

*PLIVA, Inc. v. Mensing*,
  131 S. Ct. 2567 (2011) ........................................................................ 3, 14, 15, 16

*Purkey v. Green*,
  28 F. App'x 736 (10th Cir. 2001) ............................................................................ 4

*Quarles v. Little River Energy Co.*,
  2008 U.S. Dist. LEXIS 4128 (N.D. Okla. Jan. 18, 2008) ..................................... 23

*Quillin v. American Hosp. Supply Corp., Inc.*,
  1997 WL 382095 (N.D. Okla. Mar. 31, 1997) ...................................................... 20

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312 (2008) .............................................................................................. 14

*Silver v. Glass*,
  459 F. App'x 691 (10th Cir. 2012) ........................................................................ 11

*Slover v. Equitable Variable Life Ins. Co.*,
  443 F. Supp. 2d 1272 (N.D. Okla. 2006) .............................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................ 4

*Thompson v. Allergan USA, Inc.*,
  993 F. Supp. 2d 1007 (E.D. Mo. 2014) ........................................................... 17, 18

*Welchert v. American Cyanamid, Inc.*,
   59 F.3d 69 (8th Cir. 1995) ................................................................................20

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ...............................................................................14, 15

*Yates v. Ortho-McNeil-Janssen Pharm., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ...........................................................16, 17, 18

**RULES**

Fed. R. Civ. P. 8 ................................................................................................11

Fed. R. Civ. P. 12(b)(6) ................................................................................1, 4

Fed. R. Evid. 201 ...............................................................................................5

**STATUTES AND REGULATIONS**

2 Okla. Stat. § 2-14-35(8),(10) ..........................................................................8

12A Okla. Stat. § 2-102 ...................................................................................18

12A Okla. Stat. § 2-313(1) .........................................................................18, 19

12A Okla. Stat. § 2-314(2)(f) ...........................................................................19

21 C.F.R. § 201.51.............................................................................................20

21 C.F.R. § 201.51(a) ........................................................................................19

21 C.F.R. § 201.51(g) ..........................................................................................8

21 C.F.R. § 314.3(b) ..........................................................................................18

21 C.F.R. § 314.70(b)(2)(i)..............................................................15, 16, 17, 18

21 C.F.R. § 601.12(b)(2)(i)................................................................................16

42 C.F.R. § 414.904............................................................................................5

21 U.S.C. § 352(b)........................................................................................7, 19

Food, Drug, and Cosmetic Act ..........................................................................7

Okla. Admin. Code § 35:10-11-1 ........................................................................8

Uniform Commercial Code ...................................................................18, 19, 23

OTHER AUTHORITIES

Ben Leach, *Medicare Reimbursement Cuts Caused By Sequestration Begin to Take Effect* (Apr. 4, 2013), http://www.onclive.com/web-exclusives/Medicare-Reimbursement-Cuts-Caused-by-Sequestration-Begin-to-Take-Effect ................................................................. 5

Herceptin Drug Label Information (April 2015), http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=492dbdb2-077e-4064-bff3-372d6af0a7a2 .............................................................................................. 4

Magellan Rx Mgmt., *Medical Pharmacy Trend Report* (5th ed. 2014), https://www1.magellanrx.com/media/216383/2014-magellan-rx-trend-report.pdf ................. 5

Medicare Claims Processing Manual, Ch. 17 - Drugs and Biologicals, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c17.pdf ................................................... 5, 6

Medicare Part B Drug Average Sales Price, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/index.html ............................... 5

Nat'l Institute of Standards and Technology, NIST Handbook 133, *Checking the Net Contents of Packaged Goods* (2016), http://www.nist.gov/pml/wmd/pubs/upload/h133-16-final2.pdf ............................................. 7

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Four cancer treatment clinics ("Plaintiffs") challenge Genentech, Inc.'s ("Genentech") labeling of an FDA-approved cancer medicine, not because the medicine harmed anyone, or was ineffective, or because Genentech deceived Plaintiffs into purchasing the medicine, but solely because Plaintiffs claim they are unable to extract every drop of the medicine from each vial after it is mixed with fluid to form an injectable solution.  According to Plaintiffs, they can only extract 20.2 milliliters ("mL") (or 96.4%) of the Herceptin solution in each vial instead of the entire 20.952 mL they anticipate each vial should contain following reconstitution (mixing of fluid with the Herceptin).  Plaintiffs infer from this that Genentech has misrepresented the amount of Herceptin in the vial in one of three ways: (1) by stating the vials contain 440 milligrams ("mg") of Herceptin; (2) by stating the vials contain Herceptin at a concentration of 21 mg/mL when reconstituted; or (3) by allegedly representing the vials contain 20.952 mL of Herceptin when reconstituted.[1]  Plaintiffs assert causes of action for breach of warranty and unjust enrichment.  But Plaintiffs ignore that federal law and Oklahoma law allow for minor variances in the stated contents of products, inexplicably (and unreasonably) assuming that the product labeling must state precisely to the decimal point the net weight and concentration in each vial, which is impossible to do.  Plaintiffs also have not pleaded any injury from purchasing Herceptin because they are reimbursed by Medicare and private health plans for the Herceptin they buy and administer to patients.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Genentech respectfully submits that Plaintiffs' Second Amended Complaint ("Complaint" or "SAC") fails to state a claim for relief and must be dismissed for several reasons:

---

[1] This third statement regarding the volume in milliliters does not appear in the labeling.

First, Plaintiffs allege no factual support for their belief that Herceptin vials contain less than 440 mg of Herceptin. Indeed, they attach internal Genentech correspondence to their Complaint indicating just the opposite. The vials also are labeled as "nominally" containing 440 mg, meaning the net weight may vary from vial to vial, which is entirely consistent with federal law and Oklahoma law permitting minor weight variances in the manufacturing process.

Second, given that the net weight in each vial is approximate with small variances permitted by law, it follows that the concentration of 21 mg/mL is approximate and subject to slight variation.

Third, Plaintiffs' complaint that each vial should contain 20.952 mL of reconstituted solution fails because the labeling does not state what the volume will be after reconstitution, Plaintiffs wrongly and unreasonably assume the stated weight and concentration are exact to the decimal point, and the allegation is not well-pleaded, in that Plaintiffs have not tested the amount of Herceptin solution the vials contain.

Fourth, Plaintiffs' claim that they cannot recover the full theoretical contents of 20.952 mL from each vial after reconstitution fails because the labeling does not represent that providers can extract the entire amount from each vial, and because it ignores the most plausible and completely lawful explanation for the volume extracted, not to mention the only explanation supported by their alleged testing: As with many consumer products, such as shampoo and toothpaste, Plaintiffs simply cannot recover every bit of product from the container. Federal courts have dismissed similar claims as implausible. *See, e.g.*, *Hawkins v. UGI Corp.*, 2016 WL 270372, at *2 (C.D. Cal. Jan. 21, 2016); *Ebner v. Fresh Inc.*, 2013 WL 9760035, at *7 (C.D. Cal. Sept. 11, 2013).

Fifth, Plaintiffs' claims are preempted by federal law.  Plaintiffs allege that Oklahoma law requires Genentech to market Herceptin in vials that ensure providers can recover 20.952 mL.  But due to the residual solution remaining in each vial, ensuring the vials can deliver the volume Plaintiffs demand would require Genentech to increase the amount of Herceptin in each vial beyond 440 mg and the amount of fluid beyond 20 mL.  This would require prior FDA approval.  Because Genentech cannot independently do what Plaintiffs' state-law claims require, the claims are preempted.  *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011); *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).

Sixth, Plaintiffs' warranty claims fail for the additional reasons that the statements in the Herceptin labeling are federally required disclosures rather than voluntary promises and therefore they do not constitute a warranty, and because Plaintiffs have not pleaded any actual injury:  Plaintiffs are reimbursed by Medicare and private health plans for the Herceptin they purchase and administer to their patients.

Finally, Plaintiffs' unjust enrichment claim fails for the additional reasons that Plaintiffs have an adequate remedy at law and, in any event, Genentech has not received any unjust benefit from the sale of Herceptin.

For all of these reasons, Genentech respectfully moves the Court to dismiss Plaintiffs' Complaint in its entirety.

## II.    FACTUAL BACKGROUND

Herceptin[®] (trastuzumab) ("Herceptin") is an FDA-approved prescription medication for the treatment of certain types of metastatic breast cancer and early breast cancer that overexpress a protein called HER2.p[2]  The overexpression of the HER2 protein causes breast cancers to grow

_____

[2] Herceptin is also used in the treatment of other cancer types, but its predominant use is for breast cancer.

and spread faster.  Herceptin targets this protein, which helps to slow or stop the cancer's growth.  The medicine is a highly effective treatment for women with this type of breast cancer.

Genentech supplies Herceptin in a multi-use vial nominally containing 440 mg of Herceptin as a lyophilized (freeze-dried) powder.[3]  Each vial of Herceptin is accompanied by a 20 mL vial of bacteriostatic water that is used to dissolve the powder, a process known as reconstitution.  When preparing the medication for use in accordance with its FDA-approved prescribing information, health care providers extract 20 mL of diluent from its vial using a sterile syringe and then inject it into the vial of lyophilized Herceptin powder.[4]  The resulting solution contains Herceptin at a concentration of approximately 21 mg per mL.  The providers then calculate the amount of solution needed for a specific patient based on the patient's body weight (e.g., 2 mg/kg).  Once the dose is calculated, providers withdraw the appropriate amount of solution from the vial and inject it into an I.V. bag for delivery to the patient. Any remaining Herceptin solution can be used for 28 days to treat additional patients.

---

[3]   *See* Herceptin Drug Label Information (April 2015), available at http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=492dbdb2-077e-4064-bff3-372d6af0a7a2 (last visited Feb. 16, 2016).  The Court may consider the Herceptin labeling on a motion to dismiss because it is referenced in the Complaint, central to Plaintiffs' claims, and it is a matter of public record available on the National Institute of Health's website.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examined when ruling on 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (approving district court's decision to take judicial notice of Niaspan package insert); *see also Purkey v. Green*, 28 F. App'x 736, 742 n.4 (10th Cir. 2001) (taking judicial notice of properties of prescription medication based on description of medication contained in *Physicians' Desk Reference*); *Adamson v. Ortho–McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 500–01 (D.N.J. 2006) (considering a drug packaging insert on a motion to dismiss).

[4]   *See* Dosage and Administration section, Herceptin Drug Label Information (April 2015).

Medicare and private health plans reimburse providers for the Herceptin they purchase and administer to patients.  *See, e.g.*, Medicare Claims Processing Manual, Ch. 17 - Drugs and Biologicals, at 33, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c17.pdf (showing example for Herceptin (trastuzumab)) (last visited Feb. 16, 2016).[5]  By law, the Medicare reimbursement rate is an amount equal to 106 percent of the manufacturer's average sales price ("ASP").[6]  *See* 42 C.F.R. § 414.904; Medicare Part B Drug Average Sales Price, available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/index.html (last visited Feb. 16, 2016).  Private health plans typically reimburse providers at an even higher rate than Medicare.[7]

---

[5] The Court may take judicial notice of information on government websites.  *See N.M. ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 703 n.22 (10th Cir. 2009) (taking judicial notice of information on "[t]he websites of two federal agencies"); *Buhendwa v. Regional Transp. Dist.*, 82 F. Supp. 3d 1259, 1267 n.2 (D. Colo. 2015) ("The court may take judicial notice of the contents of an agency's website."); Fed. R. Evid. 201.

[6] The federal sequestration budget cuts of 2013 effectively reduced the reimbursement rate to ASP plus 4.3 percent beginning in April 2013.  Ben Leach, *Medicare Reimbursement Cuts Caused By Sequestration Begin to Take Effect* (Apr. 4, 2013), available at http://www.onclive.com/web-exclusives/Medicare-Reimbursement-Cuts-Caused-by-Sequestration-Begin-to-Take-Effect (last visited Feb. 16, 2016).

[7] According to a recent survey of 48 commercial health plans representing 125 million covered lives, private insurers typically reimbursed physician offices for injectable drugs in 2014 at rates well above the Medicare reimbursement rate.  Magellan Rx Mgmt., *Medical Pharmacy Trend Report*, at 8 (5th ed. 2014), available at https://www1.magellanrx.com/media/216383/2014-magellan-rx-trend-report.pdf (last visited Feb. 16, 2016).

## III.   LAW AND ARGUMENT

### A.   Plaintiffs' Allegations Regarding The Net Weight, Concentration, And Total Reconstituted Volume Of Herceptin Fail To State A Claim Under Any Theory.

#### 1.   Plaintiffs' assertion that vials do not contain 440 milligrams of Herceptin is belied by their own Complaint and even if accepted as true, fails to show any misconduct.

Plaintiffs allege that Herceptin vials might not contain the labeled amount of 440 mg.[8] (SAC ¶¶ 16, 42, 45, 52(a).)  Plaintiffs contend there is a Herceptin "shortage" that "could be caused by Genentech providing 424 mg instead of the 440 mg represented and warranted by Genentech." (*Id*. ¶ 16.)  But Plaintiffs plead no facts to support this allegation, and the facts they do plead show otherwise.

Plaintiff's "naked assertion" of a "shortage" of Herceptin is insufficient to establish any misconduct by Genentech.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Only "well-pleaded factual allegations" are "entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.

The Complaint shows that Plaintiffs have not tested ___*any*___ Herceptin vials to determine whether they contain 440 mg of Herceptin, either before or after reconstitution.[9]  Furthermore, the only piece of evidence Plaintiffs rely on—internal correspondence allegedly from one of Genentech's production engineers, which is attached as Exhibit 1 to the Complaint—completely contradicts any "shortage" claim.  (*See* Dkt. 87-1)  (stating that the labeling "nominally state[s]

---

[8] Though Plaintiffs state in the Second Amended Complaint that the vials may ___*contain*___ less than 440 mg, their real complaint appears to be that they are unable to ___*extract*___ 440 mg.  (*See* SAC ¶¶ 14, 37, 41, 47, 50, 57.)  Notably, Plaintiffs' original complaint (Dkt. 2) did not allege any shortage of Herceptin lyophilized powder in the vials, only that the recoverable amount was less.

[9] The only laboratory testing Plaintiffs allege evaluated the amount of reconstituted solution they could extract from the vials, not the weight of the Herceptin.  (SAC ¶ 41.)

440 mg" and that vials are filled with "between 440 and 450 mg" of lyophilized Herceptin). Accordingly, Plaintiffs' conclusory allegations that the Herceptin vials may contain less than 440 mg should be disregarded.

Even if the Court accepts as true the allegation that vials do not contain 440 mg, Plaintiffs have not alleged any misconduct because the labeling states that the vials "***nominally*** contain[] 440 mg of Herceptin as a lyophilized sterile powder." Highlights of Prescribing Information, Dosage Forms and Strengths, Herceptin Drug Label Information (April 2015) (emphasis added).[10] Federal standards for net contents of goods define "nominal" as "[a] designated or ***theoretical size that may vary from the actual***." Nat'l Institute of Standards and Technology, NIST Handbook 133, *Checking the Net Contents of Packaged Goods*, at 182 (2016), available at http://www.nist.gov/pml/wmd/pubs/upload/h133-16-final2.pdf (last visited Feb. 16, 2016).[11] Thus, the statement in the Herceptin labeling that vials contain 440 mg refers to the approximate net weight; it is not a guarantee any particular vial contains exactly 440 mg.

Federal law allows for minor variances in the net weight of products. Although the federal Food, Drug and Cosmetic Act ("FDCA") requires that the labeling for Herceptin contain an "accurate statement of the quantity of the contents in terms of weight" of the vial, the FDCA clarifies that "reasonable variations" from the stated weight "shall be permitted … by regulations prescribed by the Secretary [of Health and Human Services]." 21 U.S.C. § 352(b). Those regulations provide that "variations from stated quantity of contents shall not be ***unreasonably***

---

[10] *See* note 2, *supra*.

[11] The National Institute of Standards and Technology is an agency of the U.S. Department of Commerce. The Court may take judicial notice of NIST publications. *See Clappier v. Flynn*, 605 F.2d 519, 535 (10th Cir. 1979) (taking judicial notice of official government publication); *Richardson,* 565 F.3d at 703 n.22.

*large*." 21 C.F.R. § 201.51(g) (emphasis added).  Plaintiffs' allegations, even taken as true, fail to establish any such variation.

Plaintiffs suggest the vials they tested as to the recoverable amount of solution "could" contain only 424 mg of Herceptin instead of 440 mg, though Plaintiffs did not test the weight of the Herceptin.  (SAC ¶¶ 42, 45.)  Even if true (and Plaintiffs plead no facts to support this), it would represent a variance of only 16 mg, or 3.6% of the stated net weight.  Plaintiffs do not explain why an alleged shortfall of 3.6% is actionable.  For example, Oklahoma law allows for much larger variances in the net weight of products.  *See* 2 Okla. Stat. § 2-14-35(8),(10) (adopting federal standards from NIST Handbook 133); *id*. § 2-14-38a (same); Okla. Admin. Code § 35:10-11-1 (same); NIST Handbook 133, at 112, Table 2-5 (permitting variation of up to 10% for products with a labeled quantity under 36 grams); *see also O'Connor v. Henkel Corp.*, 2015 WL 5922183, at *7-10 (E.D.N.Y. Sept. 22, 2015) (dismissing claims of shortfall in net weight of deodorant product as implausible in light of "reasonable variations" permitted by law). Accordingly, Plaintiffs have not pleaded any misconduct regarding the net weight in the vials.

### 2. Plaintiffs' allegations regarding the concentration of the reconstituted solution fail to show any misconduct.

Plaintiffs similarly allege that the Herceptin labeling incorrectly lists the concentration of Herceptin in the reconstituted solution as 21 mg/mL, when it "could be" 21.8 mg/mL.  (SAC ¶¶ 17, 18, 42, 46, 52(b).)  Even if the Court accepts that the concentration may be 21.8 mg/mL,[12] this fails to state a claim because the labeling does not state the concentration is "21.**0** mg/mL." As with the net weight of lyophilized Herceptin powder, the concentration of the reconstituted solution is approximate.

---

[12] Plaintiffs' only support for this allegation is the alleged 2002 internal correspondence from a Genentech production engineer, as Plaintiffs did not perform any laboratory testing regarding the concentration of the reconstituted solution.  (SAC ¶¶ 18, 41.)

Labeling the concentration as a whole number takes into account the expected variability.  Indeed, given that the concentration is determined in part by the ***actual*** net weight of the lyophilized Herceptin, which by law may vary slightly, the resulting concentration necessarily may vary slightly as well.  In addition, providers manually withdraw the diluent from a separate vial using a syringe and inject it into the vial of Herceptin, so the amount of diluent mixed with Herceptin is unlikely to be precisely 20.**0** mL each time.  A variance in the amount of diluent injected of just a fraction of a milliliter—which indisputably is beyond Genentech's control—also impacts the resulting concentration.[13]

Finally, avoiding decimal fractions in the concentration, which could not be predicted to the tenth of a milligram per milliliter in any event, makes it easier for providers to perform the mathematical calculation when determining the dosage based on the patient's body weight.  For all these reasons, Plaintiffs' allegations regarding the concentration of Herceptin also cannot be the basis for any claim.

### 3. Plaintiffs' allegation that each vial should contain a reconstituted volume of 20.952 milliliters does not show any misconduct.

Plaintiffs' allegation that each vial of Herceptin does not contain precisely 20.952 mL following reconstitution, also cannot be the basis for a claim.

First, Genentech has never stated the vials contain 20.952 mL (SAC ¶¶ 14, 37, 41, 47, 50, 52(c), 57), and Plaintiffs do not allege otherwise.  In fact, the Herceptin labeling does not state any volume each vial will contain following reconstitution. Instead, the labeling instructs providers to "[r]econstitute each 440 mg vial of Herceptin with 20 mL of Bacteriostatic Water

---

[13] Plaintiffs' reference to "overdose" is a red herring.  (SAC ¶ 46.)  Because the weight and volume is approximate, it is understood there will be minor variances in the concentration administered to patients.  This minor variance poses no harm to patients and Plaintiffs do not allege otherwise.

for Injection (BWFI), USP, containing 1.1% benzyl alcohol as a preservative to yield a multi-dose solution containing 21 mg/mL trastuzumab." (SAC ¶ 33.)

Furthermore, Plaintiffs' math—that the theoretical total volume following reconstitution should be 20.952 mL—is based on the flawed premise that the weight and concentration are exact to the tenth of a decimal. To the contrary, as discussed above, the net weight and concentration of Herceptin are approximate and the law allows minor variances. The vial-to-vial variances likewise mean that the volume after reconstitution will differ somewhat from one vial to another. Because the law permits some variability, Plaintiffs fail to show any misconduct by Genentech regarding the total volume after reconstitution.

Finally, Plaintiffs' allegation that the vial does not contain 20.952 mL is not supported by well-pleaded facts. Plaintiffs never tested how much Herceptin solution the vials *contain*. Rather, Plaintiffs consider only how much Herceptin they were able to "obtain" following the Preparation of Administration Instruction, that is, how much Herceptin they were able to extract. (*Id*. ¶¶ 38, 39). As discussed below, the fact Plaintiffs were only able to *extract* 20.2 mL of solution from the vial does not show that the vial *contained* only 20.2 mL.

**B.     Plaintiffs' Extractable Volume Allegations Fail To Show Any Misconduct.**

As shown in the previous section, Plaintiffs have not put forth well-pleaded factual allegations sufficient to warrant an assumption of truth, and even if they had, they have failed to state a claim because the weight, concentration, and total theoretical volume are approximate and the law allows for reasonable variances in manufacturing. But the gravamen of the Complaint is that Plaintiffs are unable to *extract* what they believe is the theoretical maximum amount of solution each vial should contain after reconstitution. Plaintiffs allege that the vials should contain exactly 20.952 mL, but that they are able to extract no more than 20.2 mL. (*Id*. ¶¶ 14, 38, 39, 41, 47, 50, 57.) As with the allegations in the previous section, Plaintiffs' allegations

10

regarding the "extractable" volume fail to show any misconduct.  Genentech has never represented that health care providers could extract every drop of the Herceptin solution in the vials.  Moreover, Plaintiffs' other allegations all are based on this same implausible assumption, providing another reason the Complaint should be dismissed.

Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. at 555.  Plaintiffs' Complaint does not plead "factual content that allows the court to draw the ***reasonable*** inference that [Genentech] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added) (citation omitted).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  When, as here, the complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (citation omitted); *see also Silver v. Glass*, 459 F. App'x 691, 697 (10th Cir. 2012) ("allegations consistent with unlawful conduct, but more likely explained by lawful conduct, fail to suggest a plausible claim for relief") (citing *Iqbal*, 556 U.S. at 679-80)).  Evaluating plausibility is a "context-specific task" that requires the court to draw upon its "judicial experience" and "common sense." *Iqbal*, 556 U.S. at 679.

Genentech makes no representation as to the exact amount of Herceptin that can be extracted from the vials.  Plaintiffs allege "each vial ***yields*** no more than 20.2 mL of fluid solution rather than [] 20.952 mL," meaning that Plaintiffs were only able to extract 20.2 mL of solution from the vial.  (SAC ¶ 41) (emphasis added).  But the labeling does not state the total volume after reconstitution, let alone specify a volume providers will be able to extract.  Plaintiffs pull this from thin air.  Moreover, as the Complaint acknowledges, 20.952 mL

represents the volume of solution Plaintiffs believe the vials should theoretically *contain*. Genentech has never stated that every last drop of Herceptin can be extracted from the vial.

Perhaps recognizing they cannot sustain a claim based on the amount of Herceptin they can extract, Plaintiffs go on to speculate that because they can only extract 20.2 mL, instead of the 20.952 mL Plaintiffs believe the vials should contain, Genentech must be misrepresenting 440 mg as the net weight of each vial, or misrepresenting 21 mg/mL as the concentration of the reconstituted solution. (SAC ¶¶ 42, 45, 46.) But these claims are premised on the same flawed assumption that the amount of Herceptin Plaintiffs could extract is equivalent to the amount of Herceptin the vials contain.

Plaintiffs' allegations lack plausibility because they allege only the possibility that Genentech has misrepresented the weight or concentration of Herceptin in the vial, while ignoring the rather obvious explanation as to why Plaintiffs have not recovered the theoretical maximum from the vials that is entirely consistent with the weight and volume stated in the labeling: some residual amount of solution adheres to the walls of the vial (in this instance, less than a milliliter)[14] and cannot be extracted.

Everyday experience instructs us that it is not possible to extract every last bit of product from a container. Federal courts have rejected similar complaints for failure to plausibly allege that the defendant misrepresented a product's usable weight. In *Hawkins v. UGI Corp.*, 2016 WL 270372 (C.D. Cal. Jan. 21, 2016), the plaintiff alleged that the labeling of pre-filled propane tanks was false and misleading because the tanks were labeled as having a net weight of 15 pounds but approximately 10 percent of the propane was not usable or accessible. *Id.* at *1. The plaintiff claimed the labeling misled consumers into believing the tanks contained 15 pounds of

---

[14] The minute volume Plaintiffs allege they are unable to extract (0.752 mL) is the equivalent of 0.025 fluid ounces, or less than 1/6 of a teaspoon.

"usable" propane.  *Id.*  As here, the defendants never represented that all of the propane was usable or accessible.  *Id.* at *2.  The court dismissed the claims for lack of plausibility:

> It is well-known to consumers that it may be difficult or impossible to extract every bit of a product from its packaging, as any purchaser of toothpaste, peanut butter, shampoo, and a host of other products is aware.       . . .  It is implausible that a consumer would interpret instructions regarding what to do with the ["empty"] propane tank in his possession as a representation that he would be able to utilize every last ounce of the full tank he intended to purchase.  Nor, given general consumer knowledge . . . would any such interpretation be reasonable.

*Id.*; *see also Ebner v. Fresh Inc.*, 2013 WL 9760035, at *7 (C.D. Cal. Sept. 11, 2013) (dismissing as implausible the plaintiff's claim that lip balm product was deceptively labeled because only 75% of the stated weight was reasonably accessible).  There are many products sold for which recovery of the entire contents is difficult, if not impossible.  But this does not render the statement about the quantity contained false or misleading.  *Id.* at *7 ("[T]he [lip balm] tube contains the amount of product stated on the label . . . . Simply put, the fact that the design does not allow for easy extraction of 100 percent of the product does not point to 'misleading' conduct on the part of the Defendant . . . products such as a tube of toothpaste and cosmetics such as mascara and lip gloss similarly can be difficult to extract or apply once the majority of the product has been used . . . Plaintiff points to no authority establishing that such a result is unlawful.").  Accordingly, Plaintiffs "have not nudged their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and the Complaint should be dismissed for lack of plausibility on this additional ground.

### C.    Plaintiffs' Claims Are Preempted By Federal Law.

Plaintiffs' claims are preempted because they directly conflict with federal law regulating prescription drugs.  Conflict preemption occurs when "it is impossible for a private party to comply with both state and federal requirements . . . ."  *In re Universal Serv. Fund Tel. Billing*

*Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010). The imposition of damages under state law is a form of state action subject to conflict preemption, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324-25 (2008), and thus, if federal law conflicts with a supposed state-law obligation, damages cannot be ordered.

Plaintiffs infer from the Herceptin labeling that reconstituted vials of Herceptin must deliver 20.952 mL of solution, but claim the vials deliver no more than 20.2 mL. (SAC ¶¶ 37-39.) Plaintiffs allege that Oklahoma law requires Genentech to market Herceptin in vials that ensure health care providers can recover 20.952 mL. But due to the small residual amounts of solution remaining in each vial, ensuring the vials can deliver this volume would require Genentech to increase the amount of Herceptin in each vial beyond 440 mg and the amount of diluent beyond 20 mL, both of which are the current FDA-approved specifications. It would be impossible for Genentech to comply with its federal law obligations, which prohibit Genentech from selling these vials with increased quantities of Herceptin and diluent without first obtaining FDA approval, and at the same time comply with a purported duty under Oklahoma law to sell vials that deliver 20.952 mL. Accordingly, Plaintiffs' claims are preempted and must be dismissed as a matter of law.

**1.      State-law claims that would impose obligations requiring prior FDA approval are preempted under recent Supreme Court decisions.**

The Supreme Court has established the standard for impossibility preemption in prescription drug cases in three recent decisions: *Wyeth v. Levine*, 555 U.S. 555 (2009), *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011), and *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466 (2013). The clear rule in these cases is that "[t]he question for 'impossibility' is whether the private party could *independently* do under federal law what state law requires of it." *Mensing*, 131 S. Ct. at 2579 (citing *Levine*, 555 U.S. at 573) (emphasis added). The outcome in

each of the three cases depended on the nature of the duties prescribed by the plaintiffs' claims and the federal regulations governing those duties.

*Levine* and *Mensing* both involved failure-to-warn claims based on the product labeling. The Court held that the claims in *Levine* were not preempted because federal regulations expressly allowed the brand-name manufacturer (Wyeth) to unilaterally strengthen the warnings through a "changes being effected" (CBE) supplement without waiting for FDA approval.  555 U.S. at 568 (citing 21 C.F.R. § 314.70(c)(6)(iii)).   Because the regulation allowed a unilateral labeling change by the brand-name manufacturer in these particular circumstances, the Court held that preemption would apply only if Wyeth had "clear evidence" that FDA would have rejected the CBE labeling change.  *Id.* at 571.

In contrast, the Court held that similar claims in *Mensing* were preempted because the manufacturer could not unilaterally revise the labeling.   131 S. Ct. at 2575.   As generic manufacturers, the defendants in *Mensing* were obligated to keep the "same" labeling as the brand-name counterpart.  *Id*.   The Court held that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."  *Id.* at 2581.

In *Bartlett*, the last of the trilogy, the Court held that a design-related claim against a manufacturer was preempted because the manufacturer could not unilaterally change the medication's design. 133 S. Ct. at 2471. The Court found that 21 C.F.R. § 314.70(b)(2)(i) prohibits any prescription drug manufacturer—"*whether generic or brand-name*"—"from making any major changes to the 'qualitative or quantitative formulation of the drug product,

including active ingredients, or in the specifications provided in the approved application.'" [15]

133 S. Ct. at 2471 (emphasis added). "[S]tate-law design-defect claims . . . that place a duty on

manufacturers to render a drug safer by either altering its composition or altering its labeling are

in conflict with federal laws that prohibit manufacturers from unilaterally altering drug

composition or labeling." *Id*. at 2479.

The *Levine-Mensing-Bartlett* trilogy establish that the question for preemption is whether

the manufacturer could take the action required by the state-law claim without FDA's prior

approval. *See Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015)

(holding claims preempted because the pharmaceutical manufacturer could not change the

"qualitative or quantitative formulation" of the drug without prior FDA approval); *In re Celexa*

*& Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 40-41 (1st Cir. 2015) (preemption issue

hinged on whether manufacturer could comply with plaintiff's claim without prior FDA

approval). *Bartlett* expressly recognizes that the applicable regulations apply to all prescription

drugs, "whether generic or brand-name." 133 S. Ct. at 2471. Neither a brand-name nor generic

manufacturer can change the formulation or specifications for a prescription drug (or biologic)

without FDA's prior approval. 21 C.F.R. § 314.70(b)(2)(i); *id.* § 601.12(b)(2)(i); *Carter v. Alcon*

*Labs., Inc.*, 2014 WL 989002, at *5 (E.D. Mo. Mar. 13, 2014) ("In [*Mensing*] and *Bartlett* the

Supreme Court held that state claims that would require relabeling ([*Mensing*]) or redesign

(*Bartlett*) of a drug that could not be done by the manufacturer without prior approval by the

FDA are preempted.").

---

[15] The corresponding regulation applicable to biologics, such as Herceptin, is 21 C.F.R. § 601.12(b)(2)(i).   21 C.F.R. § 314.70(b)(2)(i) and § 601.12(b)(2)(i) both state that "major changes" include "changes in the qualitative or quantitative formulation, including inactive ingredients, or in the specifications provided in the approved application."

Following *Bartlett*, courts have held that state-law claims against brand-name manufacturers are preempted when the action the plaintiffs seek could not be taken without prior FDA approval. *See Yates*, 808 F.3d at 298-300 (affirming dismissal of design-defect claims against brand-name manufacturer because change would require prior FDA approval); *In re Celexa*, 779 F.3d at 40-43 (dismissing warnings claim against brand-name manufacturer because labeling change sought required prior FDA approval); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1013-14 (E.D. Mo. 2014) (dismissing claims as preempted because eye drop manufacturer could not reduce fill volume in dropper vials without prior FDA approval); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 169 (W.D.N.Y. 2014) (dismissing design-defect claim against brand-name manufacturer because change would require prior FDA approval); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 873-75 (N.D. Ohio 2014) (same).

> **2.** **Reformulating Herceptin to ensure each vial delivers a volume of 20.952 milliliters following reconstitution would require prior FDA approval.**

Because some residual solution remains in each vial following reconstitution and extraction, the only way to ensure providers can recover 20.952 mL is to reformulate Herceptin to include more than 440 mg of Herceptin powder and more than 20 mL of diluent.[16]   But as *Bartlett* recognizes, Genentech must obtain prior FDA approval for any "major changes" to Herceptin.   133 S. Ct. at 2471.   As with other prescription drugs, federal law requires the manufacturer of a biologic to obtain prior FDA approval for any "changes in the qualitative or *quantitative formulation*, including inactive ingredients, or in the *specifications* provided in the approved application."   21 C.F.R. § 601.12(b)(2)(i) (emphasis added).   Increasing the amount of

---

[16] This assumes the concentration remains the same.  If the concentration were to change, that would be yet an additional reason Genentech would have to obtain prior FDA approval.  *See* 21 C.F.R. § 601.12(b)(2)(i).

Herceptin powder in each vial and the amount of diluent supplied with the product would constitute a change to Herceptin's "quantitative formulation" and "specifications."[17] *Thompson v. Allergan USA, Inc.* is on point. In *Thompson*, the plaintiffs challenged the volume in each vial of Allergan's eye drop product, Restasis®, claiming that if Allergan filled each single-use vial with less medication consumers would save money. 993 F. Supp. 2d. at 1009. The court found the claims preempted because "reducing the amount of medicine in each Restasis vial is a major change requiring prior FDA approval." *Id*. at 1014. Citing 21 C.F.R. § 314.70(b)(2)(i), which parallels § 601.12(b)(2)(i) for biologics, the court found that "a decrease in the fill volume of a drug product … involves a change to the specifications under the plain meaning of the statute." *Id*.; *see also Yates*, 808 F.3d at 298 (changing amount of active ingredient in birth-control patch would change the "quantitative formulation" and thus requires prior FDA approval). Increasing the quantity of Herceptin and diluent to ensure the deliverable amount Plaintiffs' state-law claims demand similarly would require prior FDA approval and thus Plaintiffs' claims are preempted.

### D. Plaintiffs' Warranty Claims Fail As A Matter Of Law.

Plaintiffs allege claims for breach of express and implied warranties. (SAC ¶¶ 48-53, 54-56.) Under the Uniform Commercial Code,[18] an express warranty can be created in two ways potentially applicable here. First, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 12A Okla. Stat. § 2-313(1).

---

[17] "Specifications" include the "acceptance criteria," or the "numerical limits" and "ranges" provided in the approved application. 21 C.F.R. § 314.3(b).

[18] Both of these claims are governed by the UCC because the underlying transaction involves the sale of goods. 12A Okla. Stat. § 2-102 (the UCC "applies to transactions in goods"); *id*. at §§ 2-103(2) & 2-105(1) (defining "goods" as "all things …which are movable at the time of identification to the contract for sale….").

Similarly, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id*. § 2-313(2).

Plaintiffs' claim for breach of implied warranty of merchantability simply duplicates their express warranty claim because it is based on the same alleged product nonconformity. Specifically, Plaintiffs allege that Genentech breached an implied warranty of merchantability by providing Herceptin that was not consistent "in kind, quality, and quantity with the representations concerning the Herceptin product." (SAC ¶ 54.)   Thus, Plaintiffs invoke the provision of the UCC stating that a breach of the implied warranty of merchantability occurs when the product does "not conform to the promises or affirmations of fact made on the container or label." 12A Okla. Stat. § 2-314(2)(f). As authorities have noted, this is essentially identical to an express warranty claim, except plaintiffs may not be required to prove reliance on the representation.  *See* James White & Robert Summers, Uniform Commercial Code 493 (6th ed. 2010) ("This is a kind of bootstrap express warranty—but different. Under paragraph (f) [of UCC § 2-314(2)], it is not necessary for the buyer to show reliance on such representations to prove that they were the basis of the bargain.").   Accordingly, the analysis of Plaintiffs' implied warranty claims collapses into the analysis of the express warranty claims.  In addition to the grounds set forth above, Plaintiffs' warranty claims fail for the reasons below.

> 1.   **The net weight and concentration statements in the Herceptin labeling are federally mandated disclosures and thus do not constitute an express warranty.**

The declarations of net weight of the lyophilized Herceptin and concentration of the reconstituted solution are not express warranties because federal law requires them.  21 U.S.C. § 352(b); 21 C.F.R. § 201.51(a) ("The label . . . ***shall*** bear a declaration of the net quantity of contents.") (emphasis added).  As a federal court in the Eastern District of New York recently explained:

> [S]tatements mandated by federal law lack the fundamental qualities of a warranty—*i.e.,* they are not "contractual commitment[s] that [a manufacturer] voluntarily undertook by placing that warranty on its product." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 444, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). The statements at issue here are net weights listed on product labels. Federal law requires them to be there. *See* 21 C.F.R. §§ 201.62(a), (f) (nonprescription drugs); *id.* §§ 701.13(a), (g) (cosmetics).[19] Accordingly, rather than voluntarily undertaken contractual commitments, they are required disclosures.

*O'Connor v. Henkel Corp.,* 2015 WL 5922183, at *10 (E.D.N.Y. Sept. 22, 2015); *see also Welchert v. American Cyanamid, Inc.,* 59 F.3d 69, 73 n.6 (8th Cir. 1995) ("A label statement specifically required by [a federal statute] and its corresponding federal regulations does not have the contractual quality of an express warranty . . . it is in the nature of a mandatory disclosure."); *Higgins v. Monsanto Co.,* 862 F. Supp. 751, 761 (N.D.N.Y. 1994) ("[E]xpress warranties have a voluntary quality, which is missing if they are mandated by [a federal agency]. The rationale that warrantors should be held to contracts that they voluntarily enter into does not apply when their actions are forced.").

This District has previously acknowledged the voluntary nature of an express warranty. *See Quillin v. American Hosp. Supply Corp., Inc.,* 1997 WL 382095, at *6 (N.D. Okla. Mar. 31, 1997) (distinguishing between an "express warranty," which is a "contractual commitment voluntarily undertaken," and "a state-imposed duty") (citing *Cipollone v. Liggett Grp, Inc.,* 505 U.S. 504, 525-26 (1992)). The declarations of net weight and concentration for Herceptin are federally mandated disclosures rather than a voluntary contractual commitment. Accordingly, they do not constitute an express warranty.[20]

---

[19] These regulations parallel 21 C.F.R. § 201.51, which applies to prescription drugs.

[20] Even if the labeling statements could be construed as express warranties, the labeling nowhere states that each vial will contain 20.952 mL after reconstitution, and makes no representation regarding the volume providers will be able to extract from each vial. *See* sections III.A.3, III.B.

### 2.     Genentech has not breached any express warranty.

Plaintiffs' warranty claims also fail because, even if the Court finds that Genentech did provide warranties regarding the amount of Herceptin, it did not breach those warranties, for all the reasons discussed in sections III.A and III.B.  Briefly summarized, Plaintiffs' allegation that vials of Herceptin may not contain 440 mg fails because (1) there are no well-pleaded facts to support it, including a lack of any net weight testing; (2) the allegation is contradicted by internal Genentech correspondence Plaintiffs attach to their Complaint; (3) the label states that 440 mg is a "nominal" amount, so some variance in net weight is expected; and (4) federal law and Oklahoma law allow for minor weight variances.

Plaintiffs' allegation that Genentech misrepresents the concentration of Herceptin after reconstitution similarly fails to allege a breach of warranty because: (1) Plaintiffs did not test the concentration of any reconstituted vial; (2) the labeling does not state that the concentration is precisely 21.**0** mg/ml and could not be accurately stated to the *tenth* of a milligram in any event; (3) the net weight of lyophilized Herceptin is approximate, so the concentration will vary slightly; and (4) labeling the concentration as a whole number instead of a decimal fraction assists providers when calculating the dose.

Finally, Plaintiffs' warranty claim regarding the volume of reconstituted solution fails because: (1) the labeling does not declare what the reconstituted volume will be, or the volume providers will be able to extract; (2) the net weight of lyophilized Herceptin varies somewhat from vial to vial, as permitted by law, thus the reconstituted volume also will vary; and (3) the claim is not well-pleaded, as Plaintiffs never tested how much Herceptin solution the vials contain.

21

### 3.     Plaintiffs have failed to plead any injury.

Plaintiffs allege that because they cannot recover from each vial the amount of Herceptin anticipated, they are "damaged due to the additional vials of Herceptin they were and are forced to purchase." (SAC ¶¶ 53, 56.)  This claim for damages fails for at least two reasons.  First, Plaintiffs have not pleaded any factual allegations to support their claim that they are paying for a "usable" amount of 20.952 mL.   Plaintiffs presume from the stated net weight and concentration of Herceptin that the reconstituted volume will be 20.952 mL, but even so, Plaintiffs have not alleged any facts to support their belief that all 20.952 mL should be extractable from the vial.  *See Hawkins,* 2016 WL 270372, at *2 ("It is well-known to consumers that it may be difficult or impossible to extract every bit of a product from its packaging, as any purchaser of toothpaste, peanut butter, shampoo, and a host of other products is aware."). Reasonable consumers understand that some residual product will be left over in the container. Plaintiffs are not damaged simply because slightly more than half a milliliter of solution remains inside the vial.

Second, Plaintiffs have not pleaded any factual support for their claim of injury.  The Complaint does not allege any specific economic loss, only that Plaintiffs have been "forced" to purchase additional vials.  While this allegation might suffice for a typical consumer, that is not true of Plaintiffs, which are medical clinics purchasing a prescription drug for administration to patients.  Plaintiffs are reimbursed by Medicare and private insurers for the Herceptin Plaintiffs purchase and administer to patients, so merely pleading that they have had to purchase more vials than they otherwise would, does not allege an injury.  Plaintiffs have not pleaded any facts to show they were not fully reimbursed for each Herceptin vial they administered to their patients.  Accordingly, Plaintiffs have not pleaded any injury and their claims fail.

### E.     Plaintiffs' Unjust Enrichment Claim Fails As A Matter Of Law.

Plaintiffs' unjust enrichment claim fails initially because they have an adequate remedy at law.  In order to succeed on an unjust enrichment claim under Oklahoma law, Plaintiffs must establish an absence of remedies at law.  *Quarles v. Little River Energy Co.*, 2008 U.S. Dist. LEXIS 4128, at *4 (N.D. Okla. Jan. 18, 2008), *aff'd sub nom Quarles v. Spess Oil Co.*, 2009 U.S. App. LEXIS 2631 (10th Cir. Feb. 10, 2009) (emphasis added and citation omitted).  "Where a party has an adequate remedy at law . . . regardless of whether the party actually recovers thereon, the party may not pursue a claim for unjust enrichment."  *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7267851, at *1 (W.D. Okla. June 15, 2011) (citation omitted).

Plaintiffs have an adequate remedy at law because the transactions that form the bases of Plaintiffs' Complaint are separate contracts for the sale of goods.  *Id.*; *Morrison v. Stonebridge Life. Ins. Co.*, 2015 WL 137261, at *7 (W.D. Okla. Jan. 9, 2015).   Under these contracts, Plaintiffs have all legal remedies available to them under the UCC, including the breach of warranty claims asserted here.  The UCC provides a comprehensive statutory scheme governing the rights and liabilities of parties to a sales contract.  For these reasons, Plaintiffs' unjust enrichment claim fails as a matter of law.

Even if the Court were to reach the merits of the unjust enrichment claim, it fails on the face of the Complaint.  Plaintiffs allege that Genentech receives "an unfair benefit" from selling vials "that yield only 20.2 mL of usable Herceptin fluid solution," while "receiving payment for 20.952 mL of product for each vial sold."  (SAC ¶ 57.)   To succeed on an unjust enrichment claim, Plaintiffs must plead facts sufficient to establish that "it is contrary to equity and good conscience for [Genentech] to retain a benefit which has come to [it] at the expense of another."  *Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272, 1280 (N.D. Okla. 2006) (citations omitted).  For all the reasons discussed in the previous sections of this brief, Plaintiffs

have not pleaded facts showing that Genentech has received any unjust benefit from its sale of Herceptin.  Further, as the court in *Ebner* noted, "whatever difficulty there is in extracting 100 percent of the product, it does not redound to the benefit of the manufacturer."  2013 WL 9760035, at *8; *id.* at *9 (dismissing plaintiffs' unjust enrichment claim).  Accordingly, Plaintiffs' unjust enrichment claim should be dismissed.

## IV.    CONCLUSION

For all the foregoing reasons, Genentech respectfully requests that Plaintiffs' Second Amended Complaint be dismissed.  Because any further amendments would be futile, the dismissal should be with prejudice.

DATED:  February 16, 2016                     Respectfully submitted,

                                           */s/* William W. O'Connor

                                           WILLIAM W. O'CONNOR, OBA #13200
                                           **NEWTON, O'CONNOR, TURNER & KETCHUM**
                                           15 W. 6th Street, Suite 2700
                                           Tulsa, OK  74119
                                           Telephone: (918) 587-0101
                                           Facsimile:  (918) 587-0102
                                           Email: boconnor@newtonconnor.com

                                                 -and-

                                           ALICIA J. DONAHUE, Bar No. 117412
                                           *(admitted pro hac vice)*
                                           **SHOOK, HARDY & BACON LLP**
                                           One Montgomery, Suite 2700
                                           San Francisco, CA  94104
                                           Telephone: (415) 544-1900
                                           Facsimile:  (415) 391-0281
                                           Email: adonahue@shb.com

                                           JAMES P. MUEHLBERGER, Bar No. 51346
                                           *(admitted pro hac vice)*
                                           **SHOOK, HARDY & BACON LLP**
                                           2555 Grand Blvd.
                                           Kansas City, MO  64108
                                           Telephone: (816) 474-6550

Facsimile:  (816) 421-5547
Email: jmuehlberger@shb.com

*Attorneys for Defendant Genentech, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of February, 2016, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Steven J. Adams
David E. Keglovits
James Wesley Scott Pebsworth
Adam C. Doverspike

**ATTORNEYS FOR PLAINTIFFS**

/s/ William W. O'Connor
William W. O'Connor